Good morning. Welcome to this circuit. Day two of our three-day sitting. We have four cases to be argued this morning. We'll hear two and then recess briefly before picking up the last two. We are somewhat insistent on the time, and so when your red light comes on, please stop in your argument, certainly finish the answer to the question, and if we want to extend the time, we will let you know. Don't depend on it. First case of the day, United States v. Vasquez. Mr. Gonzales. Good morning, Your Honors. May it please the Court. Your Honors, this case involves several issues, significant of which is the question of when do the laws of the criminalized actions which take place abroad? In other words, when is the extraterritorial application of U.S. law appropriate? One of the charges at issue here involves a case, a charge that's been known as the Kingpin Statute, which is 21 U.S.C. 848E1A, which criminalizes acts of intentional killing while engaged in certain drug conspiracies. Are you confident your client has preserved this evidence? Post the verdict, there was a motion filed alleging that this particular statute could not be applied in an extraterritorial fashion. It was considered by the Court, and the District Court rejected it. Was that framed as a challenge to the indictment or a challenge to the evidence? And, Your Honor, thank you for that. I see that the government also pointed that out. It seems to me that the challenge was that the statute could not be applied in an extraterritorial application. In Rojas, the Court there also considered it, and there it said that because the defendant failed to challenge that issue, failed to challenge the extraterritorial application, there was only a sufficiency ground there, so it was reviewed for plain error and not de novo. So I would take the position, Your Honor, that because the underlying objection specifically targeted the extraterritorial application of this, I believe it was preserved. Your Honor, this section of the statute isn't in context in the section that's titled the death penalty and actually provides for the punishment. It's punishable by death. In determining whether or not there is an extraterritorial application, case law and courts have found that unless there is a clear indication of such extraterritorial application, federal laws will be construed to have only a domestic application. This was most recently set out in Arger and Abisko, June 2016 Supreme Court case. In that case, the Court dealt with the extraterritorial application of a RICO statute, and the Court found there that there needs to be unmistakable congressional intent to apply extraterritoriality. If there is not such intent, then there is a two-step process. The first is to determine whether or not there's clear affirmative indication that it applies abroad. If not, then the Court goes on to examine the statute's focus to determine whether the case involves a domestic application. So there's been litigation on what that means, Judge, but focus, as far as the courts have set it out, is if conduct relevant to the focus occurred in a foreign country, then it involves an impermissible extraterritorial application. So do I understand RJR correctly that the Supreme Court says you can look not just at the specific charging statute, but you can look at the underlying statutes in terms of the predicate X? And in fact, it does specifically talk about the predicates, Your Honor, correct? That's, I read it the same way. Why is that? Your Honor, I believe that the RJR Nabisco limited that application specifically to if each of the underlying predicates has that extraterritorial application, then that specific underlying predicate can be used to justify that application abroad. What Mr. Vasquez was convicted on is more general drug conspiracies that may or may not include actions in this country or abroad. The underlying predicates for Mr. . . . for appellant's drug convictions aren't specifically, and I would argue, Judge, do not specifically set out under each of those that there is an application abroad for those charges. Your client was charged and convicted under 848. Correct, Judge. Right, and 848, if I recall, incorporates by reference 960. It does, Judge. Which in turn incorporates by reference 959. Your Honor, but that's one specific . . . it does also incorporate other provisions and other criminal acts. I believe RJR Nabisco holds the rule that if you have to look at the specific predicate and very clearly look, does that specific predicate allow extraterritorial application? It only is the charge under that extra . . . under that predicate. If it involves other predicates, Judge, that do not have that extraterritorial application, no matter that maybe one does, I don't see how including all of the drug conspiracies which my client was charged with. Your Honor, the part of the problem here is when you look at the focus of this statute, I would argue that it does not have a clear affirmative indication that it applies abroad. So the courts have held that you then look at legislative history and procedural context and the statute itself to determine what that focus is. It's pretty clear from my briefing and apparently from the government's briefing, Judge, that this case, this statute, has not . . . virtually never been applied for acts of killing which occurred in other countries. The District Court case found only one case, which is the United States v. Ma case, which involved killings in Canada, I believe. And in that case, U.S. v. Ma found that it held that the actual killing occurred in the United States because there was significant planning in the United States. So even though it didn't need to look beyond the statute's focus at that point, it went ahead and looked at the intent. And there found that because of the nature of the crime, it involved an extraterritorial application. Well, since that, Judge, Argyro and Abisko came in and further clarified what exactly you have to look at to determine those issues. So there has been really no other reported cases. And that's why this case is a little bit problematic, Your Honor, because on the face of the statute itself, I would argue that there is no indication, a clear indication, that there is extraterritorial application. Just to clarify . . . Yes, Your Honor. Are you . . . are there cases saying that 848E does not apply extraterritorially, or are you just saying that this is an issue of first impression? It appears to be an issue of first impression, Judge. There is no cases that say it does not apply extraterritorially that I've been able to find. Again, the only applicable cases are the District Court case opinion in this proceeding and its sites to the U.S. small case previously. Arguably, Judge, if it does not involve the explicit indication that it applies extraterritorially, then you look at the legislative history and the procedures. As mentioned, the procedure, there's only one reported case. The legislative history, there's been some briefing in the briefs on both sides, Your Honor, regarding what that legislative history is. Basically, it amounts to two things. One, there was an indication that they were concerned about killings against law enforcement. Those law enforcements happened to be in Mexico or any other country. There was discussion that that should be covered somehow. The other discussion in the legislative history, discussion of this, is that there was some concern that if there was a killing or if there was a murder conviction possible, in some countries that there may be problems with the United States extraditing certain persons from countries which that is against the law in their country. So that is the extent of the discussion of whether or not this applies outside the shores of the United States. There was no discussion as to, well, of course, if some policeman in Mexico or co-conspirator in Mexico or in any of the country is murdered, that somehow constitutes enough to have a potentially murder sentence for this statute here in the United States. And that's really the crux of this provision, this part, Judge. There's been no indication otherwise, and the record reflects that all the alleged killings occurred in Mexico. There was no killings that occurred in the United States. The appellant was not a United States citizen. There was really no indication that there was any significant planning in the record in the United States. These were wholly criminal acts, alleged criminal acts, which occurred in Mexico. So regarding the provision of whether or not to punish criminals, there's actually a section in 21 U.S.C. 848, which is E1b, that addresses killing of law enforcement officials during a drug conspiracy. So there's really no other indication, Your Honor, here that both in the focus of the act, which is the killing, is the focus of the statute. There's already criminalizing for the drug conspiracy, Your Honor, and that has other provisions that are being, that punish it. The focus of this statute really is the killing, and if the killing occurs in Mexico, there's simply not enough, there's no affirmative indication in the statute that it applies to two acts in Mexico, and certainly looking at both the procedure and the legislative history and the statute itself, there's no indication that applies to killings in Mexico. Your Honor, in addition, related to that, there is a question whether, what the substantive connection has to be between the killing and the drug charge. In U.S. v. Tepon, which is the Fourth Circuit case, Your Honor, also in the brief, the court there instructed a jury on a distinct type of homicide, which is the homicide in this, in furtherance of this continuing criminal enterprise, and said that the jury must find that the defendant was not only engaged in the continuing criminal enterprise, but the killing occurred while he was so And so in these situations, Judge, it's helpful to look at actually the breakdown of the statutes, which is what I did in the brief. There's three prongs to the statute. The first prong is, has the phrase engaged in, which is something that's, that's going to be at issue here, Your Honors. The engaged in there, the first prong of the statute, talks about an organizer or supervisor involving five or more persons and obtained substantial income. There, if a person commits a killing while engaged in such activity, then they're susceptible to that potential death penalty punishment. The second prong talks about being in furtherance of that continuing criminal enterprise. And the way courts have addressed this is the first prong talks really about the drug kink pin. That's who it's meant to address. The second prong talks about the henchman, who may not be the kink pin, Your Honors, but acts, sets out, carries out acts, including killing, which is in furtherance of the continuing criminal enterprise. The reason this is so problematic, this third prong, is because it does not require a kink pin and it doesn't even require a henchman. All it requires is a person engaging in this drug conspiracy, killing while engaged in such drug conspiracy. So it doesn't require anything else and whatever engaging in that third prong. And so the question remains, what does engaging mean, mean in that third prong? It can mean the organizing supervisor with the five plus persons, which obtains substantial income. That's not how the government's charged it and that's not how some cases I've read it. It certainly doesn't mean in furtherance of. So the question is, what does engage mean in? And the problem in this situation, Your Honor, I know I'm limited on time, but the way the government charged appellant is in an aiding and abetting situation. So if you look at the actual charge, you, a person in Mexico, can be liable for the death penalty in the United States if he in any way aids and abets this venture which results in a killing. And the government itself, Your Honor, if I may, stated that aiding and abetting includes every person that picks up a weapon, that stood guard, that interrogated people, that assisted in getting those people picked up, that they contain in the government. Moreover, whoever facilitates that and whoever's in part of that corruption, according to the government, is enough to satisfy aiding and abetting on this charge. Facilitates in control of the police or the judiciary. So, Your Honor, I'm not here to defend the allegations. I understand they're wanton and graphic. But if you have a situation where it's the extraterritorial application of a statute where, for example, if there's somebody on the phone giving out names of informants in Mexico or whichever other country, and I know that's what that person's doing, and I hand that person a pen because he needs a pen to write that information down, under the government's position in this statute, then I, in being the only U.S. citizen ever been in the United States, because I gave that person the pen, I'm aiding and abetting this criminal enterprise, which if it results in a killing, now I am subject to the death penalty in the United States. I don't know that, I don't believe that's what the statute intended, Judge, and I don't think that comports with the constitutional laws, that there has to be some connection between the act and the potential to receive the death penalty. And with that, I see that my time is up, Your Honor. Time for rebuttal. May it please the Court, Elizabeth Berenger from the Western District of Texas on behalf of the United States. First, I just want to address that standard of review question that was raised by Judge Ho. This Court's precedent suggests that a defendant is subject to a challenge that the indictment fails to state an offense, which must be raised, of course, before trial. This was raised as a sufficiency claim after trial, so therefore, under Rule 12, it was untimely, and the government raised that objection below. I know we're still figuring out, since the 2014 amendments, whether that's going to be waiver or plain error. Different circuits have gone different ways, but at most it would be plain error, and so even if this Court were to review it, it would be under the plain error standard. And under the plain error standard, or under any standard, this case involves a permissible extraterritorial application of 848E. Now, 848E, of course, as the briefing goes into in depth, was enacted as part of broad drug legislation in the Anti-Drug Abuse Act of 1988 that was designed to prevent the manufacture and So under a long line of Supreme Court precedent and Fifth Court precedent, that's Bowman, Baker, Lawrence, Villanueva, this Court can infer that Congress intended to apply the statute extraterritorially based on the nature and purpose of the broad legislation. Now, the defendant has said that somehow RJR Nabisco has changed this long line, going back to 1920s, precedent about the broad reach of these drug smuggling statutes, and it didn't. First of all, it's not clear that RJR even applies in this context. It was governing a private right of action in a civil context. This was not broad criminal legislation. We've already had a case, a district court in the Southern District of New York find that it doesn't even apply, and I will provide the Court with that authority after this argument. It's a case called Buck. But if we look to RJR and we look to Bowman, and just marrying those two together, Bowman is really talking about this type of legislation. Bowman isn't discussing criminal schemes of the right of the sovereign to protect itself, and that's very different from RJR Nabisco. And we can kind of see from Lawrence, which is this Court's opinion in 2013, and from this Court's opinion in Rojas in 2016, they're not applying Morrison, which is the predecessor to RJR Nabisco. They're not applying it because it doesn't really apply in this context. They're applying Bowman and Baker when this circuit is construing these drug smuggling and immigration statutes. But even if this Court were to apply RJR, it's consistent with that Supreme Court decision. These underlying drug statutes, which Villarreal referred to as predicates, I think a more apt term is condition precedent offenses because it doesn't require a conviction of those statutes. But they apply extraterritorially. And just to follow up on Judge Ho's question, we — all of the charges that were charged in this case, the conspiracy charges, apply extraterritorially. So we have count 4, distribution for import, which is 959A. Rojas says that that applies extraterritorially. We have the import charge in counts 3 and 7, under 21 U.S.C. 952. Perez-Herrera says that that applies extraterritorially. We have possession with intent to distribute under 21 U.S.C. 841A1. That is counts 2, 6, and 8. And Baker, going all the way back to the 1980s, holds that that statute applies extraterritorially. So just as in RJR, the 848 extraterritoriality is — it's coextensive with these underlying offenses. Just to note, too, that in interpreting congressional intent, there's a bit of, in RJR, about not interpreting it to make Congress do something where it's resulting in difficult line drawing or counterintuitive results. So we're not going to interpret Congress's intent to be counterintuitive. And that applies in this case. It would make no sense to condition this application of the statute based on where the killing occurred. So take Reyes, for example, Rodolfo Reyes. He's the cooperator who's the U.S. citizen. He tips law enforcement to a drug load that came in in Camado, Texas. So he tells law enforcement, this drug load's coming in. U.S. law enforcement seizes a drug load in Texas, in the Western District of Texas. And then, as a result of that, Reyes is summoned to Mexico, called on his U.S. cell phone while he's in the United States, and summoned down to Mexico to report in where he will eventually be brutally murdered and tortured and die a horrible death. So — and they're summoning him there for a very important purpose. The evidence in this case shows that they're using that border as a barrier. They have paid off and made the Mexican law enforcement in Piedras Negras completely ineffectual. So, in effect, they're shielding themselves from the U.S. law enforcement and calling a U.S. citizen down south, just south of Eagle Pass, Texas, in order to murder him. And what's also important is that, during the murder and the torture of Reyes, the defendant is calling the person that he recruited in the United States, who's in Eagle Pass, Texas, and is asking her questions like, is this the man? Did he tell you where this drug load was? Is he the one? And having a U.S. citizen on the U.S. side confirm this information. It makes no sense in this way to not apply this statute based on a killing that occurs in Mexico. This is all about a violation of U.S. drug laws and the extreme violence that results as a result of this extreme violence. And — You agree with opposing counsel this is an issue of first impression? It is an issue of first impression in this circuit. As far as to the Anti-Drug Abuse Act of 1988, as far as drug smuggling laws, the law is well-established that they can't apply extraterritorially. Not as to 848E? This is correct, yes. I didn't find any circuit addressing this specific statute. And — To me, like, that means 841E is not used for this with any regularity. Indeed, it almost never is. Any particular explanation why this would be the first such case? I can't speak to that. I don't have any data on that. I just know that we charged it. It followed the law. It complies with the statute. It's consistent with both the statute and precedent. And that's why it happened in our circuit. I mean, we're a border state. I don't know how often this comes up. But in Western District, we have — we're 60 feet from just on the other side of the Rio Grande. This is a very real issue for us border districts to have to deal with people who come into the United States and summon United States and recruit U.S. citizen teenagers from Eagle Pass High School to run their drugs and then use the border as a shield. So it's hard to imagine that when — and Congress seemed very aware of this. This is all about the congressional intent. And Congress was aware that U.S. law enforcement officers were being murdered in Mexico. They were aware of the global violence that was occurring as a result of the violation of U.S. drug laws with drugs that — I mean, we can't forget that these people are committing 841A violation. And they're committing import violations. They're committing a desire and a conspiracy to pump drugs into the United States. These are not just drugs in general. They're drugs intended for the U.S. market. They're intended for U.S. citizens and residents. And I just would like to note that Villanueva — in Villanueva, this court expressed concerns about creating free zones just beyond the border. And that's what the result would be if we didn't apply 848 extraterritorially. Now, I know that the Defense Council raised some concerns, especially in the context of the aiding and abetting instruction that were somehow giving rise to these comedy concerns of, you know, applying the statute to people that really are — have very little contact to the United States. And although that's not present in this case — again, the defendant was living in the United States, his wife owned property in the United States, frequently seen across the border in the United States, so that's not this case — but those comedy concerns can be met by other doctrines and laws, such as forum not convene or constitutional challenges based on a lack of personal jurisdiction. That's not what we're talking about here. We're talking about did Congress intend to apply the that has minimum contacts for some reason. So — I don't know if the court has any other concerns about this extraterritoriality. I would just like to briefly address the jury instruction in this case. First of all, the court need not reach the issue of the jury instruction, because even if everything the defendant says is true — and the government would probably agree there needs to be some sort of substantive connection between the statute and the killing — I mean, the drug — the violation of the drug law and the killing. I mean, that's evident from the case law. But even if the court's instruction was overly broad, even if the jury strayed beyond the ordinary meaning of instructing them that it must be — the defendant must kill while engaged in the violation of these prejudices, it affected the substantial rights of the defendant. I mean, all of these murders here were very much connected to the drug violations. We have Rodolfo Reyes, who I just discussed, and Severino Abascal. They were cooperators killed for giving information into U.S. law enforcement. Pancho Cuellar was cooperating with U.S. law enforcement. And as a result, upwards of 300 people were killed, including Victor Cruz and his entire family, his young children. Jorge de Leon owed a drug debt to the cartel. He was forced to witness brutal murders by the defendant in order to extort him and his family to pay off the drug debt that he'd lost. De Leon also testified to four children who were murdered because they were suspected of working for a rival cartel. There was the murder of three Mexican military people who were charged with investigating these crimes in Mexico and presents one of the greatest threats to the Zetas in Piedras Negras. So, all of these murders were very much substantively connected with this. So, the defendant can't demonstrate any sort of prejudice from that jury instruction. As far as aiding and abetting liability, the law is clearly established under Villa Real that aiding and abetting liability does apply to 848. It's taken into consideration when giving the death penalty or not. Of course, this was not a death penalty case. This was a death penalty case. The evidence overwhelmingly supported the government's theory that the defendant acted as a principal. He, in fact, was the killer in many of these murders, the one putting the victim to the floor, as you like to call it, the brutally murdering people in front of other people. So, this is not really a case that raises those same concerns. And if the court doesn't have any further questions, I would just respectfully request that you affirm the sentence in judgment, and I would cede the rest of my time. We'll take it back. Up to you, Mr. Gonzalez, five minutes. Thank you, Your Honor. May it please the Court. Your Honor, I'm going to try to take a second bite at the apple there on the issue of sufficiency. So, in Rojas, which is 812 Federal Third 382, this issue came up. In that case, the defendant basically complained about the sufficiency and not — did not complain about the extraterritorial application. And there, Rojas found that because he was only complaining about the sufficiency, the standard was for plain error and not de novo. So that — that — Your Honor, there may be some argument as to how that specifically affects whether or not that's an indictment issue or not, but clearly, in Rojas, it seemed to recognize that challenging the constitutional or the extraterritorial application of the statute carries some substantive rights on appeal. I would also like to address, again, the issue of the predicates. So, I would like to clarify that, you know, RJ Anabisco itself said this was a unique statute, because in a RICO situation, you don't necessarily have a discrete act. What you basically have is a — is a concert of predicates. And that — those predicates coming together form the basis of the criminality. So, even in RJ Anabisco, the Court found that that was a unique statute. Here, just because — I would argue, Your Honor, just because a — one of the prongs of this conspiracy that they're alleging here happens to apply extraterritorially, here itself, the — the killing is the focus of the statute. It's not like RJ Anabisco, where there is a conglomeration of these predicates. There is an additional requirement of the killing. So, for that, I would argue that that does have to either be specifically applied abroad or somehow made clear through interpretation, and that's what it meant. The issue is, why would the government charge this case? And Your Honor's brought up a good point. If, on one hand, they have to raise that the person's an organizer, and there's five more people, and he has significant income, why would anybody charge that, when you could simply get all that and more? Because they do allege — in the trial, they allege that my client was an organizer. You can get away with all that. Just ignore all that and say, hey, if he's involved in the drug conspiracy, and there's a murder, and it doesn't mean if he has to do it. You know, without going into all the details, Judge, there was — there was a dozen or more killings — more my client did not have a hand in most of them. That's an interesting way to put it, Judge. But the allegations were that there were, you know, only a handful of alleged killings at the hands of my client. So the majority of the culpability for count one, where they have this long list of people that are accused of my client being involved in killing, is the aiding and abetting. And in the aiding and — if you find that the statute requires that a person kill while engaged in this drug conspiracy, that's not what the jury charge holds. The jury charge says that to participate in this, which means the defendant for the aiding and abetting must have purposely participated in the criminal venture. So to participate, he just engaged in some affirmative conduct — not the drug conspiracy — some affirmative conduct designed to aid the venture, or some engage in affirmative conduct to assist the principle of the crime. So, again, Your Honor, I go to the issue, and I addressed with the Court — I don't have much time — but the issue with Rosamond and the Supreme Court. In those situations, the Supreme Court said, hey, there has to be a connection. If you're — in that particular case involved a weapons charge, if there's going to be a robbery or some kind of felony with a weapons charge, and if you're going to get somebody for aiding and abetting, there should be evidence or a requirement that the person knew about the weapon. In this situation, as I mentioned, the way it's — it's — the way the government argues and the way the jury was instructed, it could — regardless of what they specifically alleged against my client, what they're arguing as a policy matter is, if I'm, you know, a 19-year-old kid in Mexico, and I call on the cell phone to give some indication of information that can result in a killing, or I give my pen to somebody taking down information about alleged victims, under this scenario, then I'm susceptible to have a capital — I mean, to have a death sentence penalty in the United States. I don't believe that's what the statute intended. I don't believe that United States v. Rojas, which also talks about how the extraterritorial application of these statutes have to mesh with international law. I don't believe that the interpretation being taken by the government satisfies either of those. Thank you, Your Honors. All right, counsel.